NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
:
**JOSEPH AURIEMMA, JR.,** :
: **Civil Action No. 13-5947**
*Plaintiff*, :
: **OPINION**
:
v. : **August 31, 2015**
:
**CAROLYN W. COLVIN,** :
**Acting Commissioner of Social Security,** :
:
*Defendant*. :
_____ :

**ARLEO**, **UNITED STATES DISTRICT JUDGE**

**I.   INTRODUCTION**

Before this Court is Plaintiff Joseph Auriemma, Jr.'s ("Plaintiff") request for review, pursuant to 42 U.S.C. §§ 1383(c)(3), 405(g), of Administrative Law Judge Barbara Dunn's (the "ALJ") unfavorable decision with respect to Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income Benefits (collectively, "Disability Benefits").[1] Plaintiff argues that the Commissioner's decision is not supported by substantial evidence. For the reasons set forth in this Opinion, the Court disagrees. Accordingly, the Commissioner's decision is **AFFIRMED**.

**II.   APPLICABLE LAW**

  **A.  Standard of Review**

---

[1] The ALJ's decision is imputed to the Commissioner of Social Security, who is the defendant in any appeal to the District Court. Therefore, the Court shall refer to the ALJ's July 31, 2012, decision as that of the Commissioner.

1

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g). This Court must affirm the Commissioner's decision if there exists substantial evidence to support the decision. 42 U.S.C. § 405(g); Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003). Substantial evidence, in turn, "means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995). Stated differently, substantial evidence consists of "more than a mere scintilla of evidence but may be less than a preponderance." McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).

"[T]he substantial evidence standard is a deferential standard of review." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Accordingly, the standard places a significant limit on the district court's scope of review: it prohibits the reviewing court from "weigh[ing] the evidence or substitut[ing] its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Therefore, even if this Court would have decided the matter differently, it is bound by the Commissioner's findings of fact so long as they are supported by substantial evidence. Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (quoting Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001)).

In determining whether there is substantial evidence to support the Commissioner's decision, the Court must consider: "(1) the objective medical facts; (2) the diagnoses of expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; and (4) the claimant's educational background, work history, and present age." Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1973).

### B. Five-Step Sequential Analysis

In order to determine whether a claimant is disabled, the Commissioner must apply a five-step test. 20 C.F.R. § 404.1520(a)(4). First, it must be determined whether the claimant is currently engaging in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). "Substantial gainful activity" is defined as work activity, both physical and mental, that is typically performed for either profit or pay. 20 C.F.R. § 404.1572. If it is found that the claimant is engaged in substantial gainful activity, then he or she is not disabled and the inquiry ends. Jones, 364 F.3d at 503. If it is determined that the claimant is not engaged in substantial gainful activity, the analysis moves on to the second step: whether the claimed impairment or combination of impairments is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). The regulations provide that an impairment or combination of impairments is severe only when it places a significant limit on the claimant's "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimed impairment or combination of impairments is not severe, the inquiry ends and benefits must be denied. Id.; Ortega v. Comm'r of Soc. Sec., 232 F. App'x 194, 196 (3d Cir. 2007).

At the third step, the Commissioner must determine whether there is sufficient evidence showing that the claimant suffers from a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If so, a disability is conclusively established and the claimant is entitled to benefits. Jones, 364 F.3d at 503. If not, the Commissioner, at step four, must ask whether the claimant has a "residual functional capacity" such that he is capable of performing past relevant work; if that question is answered in the affirmative, the claim for benefits must be denied. Id. Finally, if the claimant is unable to engage in past relevant work, the Commissioner must ask, at step five, "whether work exists in significant numbers in the national economy" that the claimant is capable of performing in light of "his medical impairments, age, education, past work experience, and 'residual functional capacity.'" 20 C.F.R. §§ 404.1520(a)(4)(iii)-(v); Jones, 364 F.3d at 503. The claimant bears the

burden of establishing steps one through four, while the burden of proof shifts to the Commissioner at step five.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

### III. BACKGROUND

#### A. PROCEDURAL HISTORY

Plaintiff first applied for disability insurance on May 13, 2010, alleging physical disabilities from a back injury, a heart condition, and diverticulitis.  Tr. 27, 171.  That application was subsequently denied both initially and upon reconsideration, and Plaintiff ultimately sought his first hearing before the ALJ, which occurred on March 9, 2012.  Tr. 45.  The ALJ conducted a second hearing on June 27, 2012.  Tr. 71.  Following the hearings, the ALJ issued a decision on July 31, 2012, finding that Plaintiff did not have a disability.  Tr. 27-39.

#### B. Factual Background

##### 1. Plaintiff's Work History

Plaintiff is a 58-year-old man who alleged that he became disabled and unable to work on May 13, 2010.  Before, Plaintiff held several jobs that he claims were affected by his disabilities.  From 1985 to 2007, Plaintiff was employed as a foreman for a road maintenance crew in the Borough of Florham Park.  Tr. 48, 57, 172.  From 2007 to 2008 he worked as a security guard, where he watched a gate and searched vehicles.  Tr. 75, 172.  He was eventually fired from that position, he alleges, because he was unable to both stand for long periods due to his back pain and stay at his security post without relief for bathroom breaks due to his bowel issues.  Tr. 48-49.  Plaintiff then found new employment doing clerical work at a store that sells Christmas trees, where he was employed from October 2009 until he was fired in March 2010.  Tr. 46-48.  Plaintiff states he was fired for taking a week off due to back pain and possibly for diverticulitis issues.  Tr. 48.  Two months later, Plaintiff alleges that he became disabled.

### 2. Plaintiff's Medical History

With respect to his diverticulitis, Plaintiff suffered from recurring stomach issues dating back to 1997. These issues consisted of frequent attacks of diarrhea and stomach pains, which were exacerbated by stress and which impacted his diet. Tr. 61, 299. Plaintiff states that he underwent colon resection in February 2001, and, although he did not mention any further surgeries, he alleges that he continued to have diverticulitis attacks for which he takes medication. Tr. 61.

Plaintiff's issues with his heart also date back to 1997. That year, he underwent an angioplasty and received three stent placements to combat significant coronary blockage. Tr. 56, 267. He continued to visit a cardiologist roughly twice a year and had stress tests every six months showing generally stable results, though Plaintiff complained of trouble breathing due to his heart condition. Tr. 56, 59, 233. Dr. David G. Dickson, a cardiologist, examined Plaintiff on two occasions. After a July 12, 2007 exam, Dr. Dickson reported that Plaintiff was slightly obese but his maximum heart rate reached 95% of the maximum predicted rate for people his age; his electrocardiograms and response to exercise were normal; and he had a low likelihood of occlusive coronary artery disease, though he needed to exercise and lose weight. Tr. 232-34. Dr. Dickson observed similar results after the second exam on March 26, 2009. Tr. 229.

Plaintiff also visited two consulting medical sources—Drs. Henry Rubenstein and Justin Fernando—both of whom found Plaintiff's heart condition to be generally normal. Dr. Rubenstein, a consulting internist, examined Plaintiff on August 23, 2010, noting that while he had high blood pressure, his pulse rate was normal, his heart had a normal rhythm, and he did not have chest pain or significant shortness of breath. Tr. 267. Likewise, Dr. Fernando, a consulting physician, documented that (1) Plaintiff had stress tests conducted every six months, all with

normal results; and (2) Plaintiff denied having any respiratory problems.  Tr. 291.  Dr. Fernando did, however, diagnose Plaintiff with coronary artery disease and hypertension, but observed no intolerance to physical activity due to the disease.  Tr. 292.

Plaintiff's issues with lumbar pain began in 2006.  In July 2006, Plaintiff suffered a work-related back injury after jumping off the back of a vehicle.  Tr. 51-52.  This injury gave rise to a workers' compensation claim that settled in 2008.  Tr. 52.  From the date of the injury on, Plaintiff complained of shooting lower-back pain, inability to walk or stand for extended periods, and inability to bend over or lift objects over 20 pounds.  Tr. 50, 53.

After the 2006 incident, and as part of his workers' compensation claim, Plaintiff was examined twice by Dr. Carl P. Giordano, an orthopedic surgeon.  After an examination on September 15, 2006, Dr. Giordano noted that while Plaintiff complained of back pain, his MRI was "quite benign," revealing only mild stenosis.  Tr. 253.  At that time, Dr. Giordano and Plaintiff were "both in agreement that his MRI findings and his symptoms are not significant enough to warrant further intervention."  Id.  Dr. Giordano estimated that Plaintiff could return to work in a matter of days.  Id.  Four years later, on June 16, 2010, Plaintiff returned to Dr. Giordano complaining of worsening back and lower extremity pain, though Dr. Giordano noted that Plaintiff was able to stand erect, ambulate without a limp, and had normal sensation.  Tr. 250-51.  Dr. Giordano performed an MRI examination two weeks later, which again revealed only mild stenosis.  Tr. 248.

Plaintiff's visits to Drs. Rubenstein and Fernando also produced findings related to his back.  Dr. Rubenstein observed Plaintiff's normal gait and ability to bend and squat, as well as full muscle strength and lumbar range of motion limited to 70 degrees out of the normal 90 degree range.  Tr. 267-72.  Dr. Rubenstein recognized that Plaintiff was suffering from chronic back pain,

and noted that Plaintiff had exertional limitations of occasionally lifting 20 pounds, frequently lifting 10 pounds, and standing or sitting with normal breaks for a total of 6 hours in an 8-hour day. Tr. 275. Dr. Fernando also noted Plaintiff's normal range of mobility, no acute distress, and did not observe any spinal tenderness or spasms in the neck or back. Tr. 292. Dr. Fernando diagnosed Plaintiff with chronic lower back pain and observed disk herniation in the lower back, based on an LS spine film. Tr. 292, 294. Dr. Fernando therefore concluded that it was possible Plaintiff would not be able to engage in physically demanding activities. Tr. 293.

In addition to the consultant physician visits, Plaintiff received examinations from Dr. Cheryl Wong, Dr. Theodora Maio, and Dr. Alena Polesin. Tr. 315-16. On November 5, 2008, Plaintiff visited Dr. Maio and Dr. Wong, both of whom work for the same medical association. Tr. 219, 223. During that visit, Dr. Maio found that Plaintiff had muscle spasms and painful withdrawals throughout the lumbar spine; tenderness throughout the lower back and joints; and, based on review of a 2006 MRI, disc bulges at L2-3 and L4-5 and disc herniation at L3-4 with associated loss of range of motion. Tr. 219-20. She concluded that Plaintiff had permanent orthopedic disability of 45% of total. Tr. 221. Dr. Wong also observed spinal issues at L2-3, disc herniation at L3-4, and bulging at L4-5, though she assessed Plaintiff at an impairment of 30% of total. Tr. 223-24. Plaintiff then returned to Dr. Maio on July 12, 2011, who again diagnosed him with disc bulges in L3-4 and L4-5 with residual loss of range of motion. Tr. 319. Dr. Maio nonetheless increased the severity of her conclusion, finding that Plaintiff now suffered from an orthopedic disability of 60% of total, rather than 45%. Id. Dr. Maio's medical records contain no comparison to the original disability total or explanation for the increase.

Around the same time, on May 13, 2011, Plaintiff visited Dr. Polesin. Tr. 309. Plaintiff complained of pains in his back, legs, and arms, though Dr. Polesin's examination revealed no

7

asymmetry, swelling, tenderness, palpitation or any significant range of motion restrictions. Tr. 309, 311, 315. Dr. Polesin noted spinal stenosis with lower back spasms and radicular symptoms, and recommended that Plaintiff receive steroid injections. Tr. 315-16.

Plaintiff also visited Dr. Seung Park and Dr. Andrew Przybyla, who provided residual functional capacity assessments. Tr. 274, 280. Based on an evaluation conducted in October 2010, Dr. Park and Dr. Przybyla reached similar conclusions that Plaintiff retained the capacity to sit, stand, or walk with normal breaks for a total of 6 hours in an 8-hour day; and to lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently. Tr. 279, 280. Dr. Park added that Plaintiff could never climb ladders, ropes, or scaffolds, though he could occasionally balance, stoop, kneel, crouch, and crawl. Tr. 279.

At hearings before the ALJ on March 9th and June 27, 2012, Plaintiff testified that he continued to suffer from significant back pain, which he described as lightning bolts going down his legs, Tr. 53; significant wrist pain due to a surgery to repair a broken bone, which caused numbness and loss of strength in his right hand, Tr. 55; occasional flare ups of diverticulitis, Tr. 55; and an inability to lift anything over 20 pounds or climb anything. Tr. 69. Based on a review of Plaintiff's file and hearing testimony, a vocational expert, Patricia Sasona, testified that Plaintiff's past relevant work qualified him as a "Gate Guard" under Department of Transportation Code 372.667-030, which is a semi-skilled occupation performed at light physical demand level. Tr. 76.

### C. The ALJ's Decision

As to the first step of the five-step analysis, the ALJ found that the claimant was not engaged in substantial gainful activity. Tr. 29. Next, the ALJ found that Plaintiff has the following severe impairments: (1) diverticulitis; (2) coronary artery disease (status-post myocardial infarct);

8

(3) hypertension; and (4) degenerative disc disease of the lumbar spine with radicular symptoms. Id. Turning to step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 29-30.

The ALJ next determined Plaintiff's residual functional capacity ("RFC") allows him to perform light work as defined by 20 C.F.R. § 404.1567(b). Tr. 30. Specifically, the ALJ concluded Plaintiff could lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently, stand/walk (with normal breaks) for about 6 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday. Tr. 37-38. The ALJ also found that that Plaintiff could never climb ladders, ropes, or scaffolds, and can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. Tr. 30, 37-38. Based upon Plaintiff's past work experience as a security guard, the ALJ concluded Plaintiff could return to his past relevant work, and, therefore, was not disabled. Tr. 38.

## IV. ANALYSIS

Plaintiff argues that the ALJ: (1) did not fully consider all of Plaintiff's impairments; (2) did not properly evaluate Plaintiff's subjective complaints when determining his RFC; and (3) improperly concluded that Plaintiff could perform light work and past relevant work as a gate guard. The Court will address each argument in turn.

### A. Full and Fair Consideration of Impairments

Plaintiff first challenges the decision on the ground that the ALJ did not fully or fairly consider evidence of his impairments when evaluating his RFC. Dkt. No. 21, Pl.'s Br. at 12-15. Essentially, the Plaintiff argues that the ALJ failed to provide meaningful discussion of the medical source statements of opinion and documented clinical findings regarding his back pain,

9

impairments in his upper extremities, and diverticulitis. Because the ALJ's findings as to these impairments are all supported by substantial evidence, Plaintiff's argument is rejected.

As an initial matter, throughout Plaintiff's argument about the RFC, he also argues that the ALJ should have analyzed his leg and hand/finger impairments at step 2. See Pl.'s Br. at 15 (requesting remand to properly evaluate Step 2). To the extent Plaintiff raises these step 2 issues, however, the Court disagrees. At step two, the ALJ found that Plaintiff's heart, bowel, blood pressure, and back impairments were severe, but did not include a finding as to leg or hand/finger pain. Tr. 29. So long as the ALJ rules in Plaintiff's favor by finding that any single impairment meets the severity threshold required at step two, any error the ALJ made in this determination was harmless. Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 (3d Cir. 2007). Here, because the ALJ found that several of Plaintiff's impairments were severe, any error regarding the severity of Plaintiff's leg and hand/finger pain at step two would be harmless and thus not reversible error.

Turning next to the RFC, Plaintiff argues first that the ALJ gave too much weight to the determination of Dr. Giordano, the orthopedic surgeon who examined Plaintiff in 2006 and 2010, because the determination was against the weight of the medical evidence.[2] Pl.'s Br. at 12-13; Dkt. No. 26, Pl.'s Reply Br. at 2. The Court disagrees. As stated above, Dr. Giordano found only mild stenosis and otherwise benign results; observed that Plaintiff was not in any physical distress; and conferred with Plaintiff, who agreed that further intervention was not necessary. Tr. 253. These results are consistent with the weight of medical evidence. As the ALJ explains in his decision, the examinations conducted by Dr. Rubenstein on August 23, 2010, and Dr. Fernando

---

[2] According to Plaintiff's testimony, Dr. Giordano was not technically his treating physician because Plaintiff was required to see Dr. Giordano as part of his workers' compensation claim. Tr. 64. Dr. Giordano's findings will therefore not be given the weight accorded to treating physicians' opinions.

on February 9, 2011 show similar results. Both physicians noted that Plaintiff had a normal gait, full muscle strength, had no difficult getting on the exam table, could walk for a reasonable amount of time, and was able to squat and walk on his heels and toes. Tr. 268, 272, 292-93.[3] Their reports otherwise show no real discrepancies with those of Dr. Giordano. The ALJ's decision to credit Dr. Giordano's evaluations was therefore supported by substantial evidence.

Plaintiff next argues that the ALJ should have given more weight to several of Plaintiff's treating physicians' opinions. Pl.'s Br. at 3, 5, 8; Pl.'s Reply Br. at 1-2. As part of her analysis, the ALJ must consider Plaintiff's treating physicians' opinions. Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994). The opinions of treating physicians are given substantial, and sometimes even controlling, weight. 20 C.F.R. §404.1527(d)(2); Cotter, 642 F. 2d at 704. The opinions of treating physicians may be rejected outright only if there is clear contradictory medical evidence. Fouch v. Barnhart, 80 F. App'x 181, 185 (3d Cir. 2003) (citing Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)). Such opinions also "may be accorded more or less weight depending upon the extent to which explanations are provided . . . ." Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 118 (3d Cir. 2012) (citing Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quotation omitted)). If there is conflicting medical evidence, the ALJ is allowed to choose which source to credit so long as he considers all of the evidence and provides some reason for discounting the evidence rejected. Fouch, 225 F.3d at 317. Moreover, the diagnosis of a condition, without more, is not enough to establish disability. Foley v. Comm'r of Soc. Sec., 349 F. App'x 805, 808 (3d Cir. 2009) (citing Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990)). Additionally, disability determinations are reserved to the Commissioner of the Social Security Administration; statements

---

[3] While Dr. Fernando opined that "it is conceivable . . . that [Plaintiff] will not be able to engage in physically demanding activities," Tr. 293, the ALJ correctly explains that the statement is consistent with Plaintiff's RFC, which was assessed at a light level or work. See Tr. 34.

11

by doctors or medical experts that Plaintiff is disabled do not override the conclusions the Commissioner is legally authorized to make nor do they guarantee or necessitate a finding of disability. 20 C.F.R. § 404.1527(d)(2). As noted previously, the ALJ does not need to consider every piece of evidence, and needs only to provide explanations for why contradictory evidence was rejected. Burnett, 220 F.3d at 122.

Here, Plaintiff argues, the ALJ did not fully discuss the findings of Dr. Polesin and Dr. Maio, and ignored all together the findings of Dr. Wong. The Court disagrees. As to Dr. Polesin, the ALJ's decision devotes several paragraphs to her findings, which were largely consistent with other medical evidence. Tr. 35. As the ALJ notes, Plaintiff complained of lower back and leg pain, though Dr. Polesin observed no acute distress, normal range of motion in his ankles, normal gait and ability to walk on heels and toes with good balance and stability. Tr. 309-10, 315. Dr. Polesin also reviewed the 2010 MRI, and, similar to Dr. Giordano, found "no instability or worrisome features." Tr. 315. The ALJ therefore satisfied the evidentiary standard in explaining Dr. Polesin's results.

As to Dr. Maio's opinions, the ALJ chose to accord them little weight because they were insufficiently explained. Tr. 36. This decision is also supported by substantial evidence. The ALJ focused on the change in the severity of diagnosis from 2008 to 2011 that lacked explanation. The ALJ gave the initial 45% disability evaluation little weight in light of the other medical evidence explained above and the fact that the Plaintiff's final award for his compensation claim was only 15% of partial total disability of the lumbar spine. Tr. 36. The ALJ thereafter explained his rejection of the 60% disability evaluation on the grounds that the records submitted for her second review—e.g., Dr. Giordano's reports, the 2010 MRI, a previous MRI from 2006, Plaintiff's answer to his claim petition—did not contain any new information, and she did not include any explanation

for the change. Tr. 319. The ALJ was permitted not to credit Dr. Maio's findings given that he considered all of the evidence and provided some reason for doing so. See Fouch, 225 F.3d at 317. His decision was thus supported by substantial evidence.

Lastly, although Plaintiff is correct that the ALJ did not mention Dr. Wong's findings from the November 2008 examination, this omission does not warrant remand. Dr. Wong's report includes findings similar to (in fact, less severe than) the report of Dr. Maio, which the ALJ addressed in full and gave little weight to. That is, Dr. Wong's finding of 30% disability was similar to Dr. Maio's 45% assessment, and their findings regarding Plaintiff's disc bulges and herniations were virtually identical. The ALJ's analysis and rejection of Mr. Maio's findings therefore accounts for the same medical evidence in Dr. Wong's report. Accordingly, the ALJ's failure to discuss Dr. Wong's findings was harmless.

### B. Subjective Complaints of Pain

Plaintiff next argues that the ALJ failed to consider her subjective complaints of pain. Pl.'s Br. at 15-17. In assessing whether the claimant is disabled, the ALJ must give consideration to the claimant's subjective complaints of pain. 10 C.F.R. §§ 404.1529, 416.929; Dorf v. Bowen, 794 F.2d 896, 901 (3d Cir. 1986). Subjective complaints alone, however, will not establish that a claimant is disabled. Dorf, 794 F.2d at 901. Although "assertions of pain must be given serious consideration," Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), Plaintiff still "bears the burden of demonstrating that her subjective complaints were substantiated by medical evidence." Alexander v. Shalala, 927 F. Supp. 785, 795 (D.N.J. 1995), aff'd, 85 F.3d 611 (3d Cir. 1996). Accordingly, subjective claims of pain and impairment "will not alone establish . . . [disability]; there must be medical signs and laboratory findings . . . [demonstrating] medical impairments, which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §

404.1529(a). The <u>Alexander</u> Court further noted "[e]ven in situations where a subjective complaint of pain coincides with a known impairment, it is within the discretion of an ALJ to discount that claim if there is a rational basis to do so." <u>Alexander</u>, 927 F. Supp. at 795.

Here, the ALJ considered Plaintiff's subjective complaints, concluded that Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms, but found Plaintiff's statements as to the intensity, persistence, and limiting effects of these symptoms were not substantiated by the objective medical evidence. Tr. 31. This determination is supported by substantial evidence. For example, the ALJ discusses Plaintiff's testimony about difficulty breathing due to heart attacks, but notes that four cardiovascular reports resulted in "unremarkable" findings and, during the 2010 visit to Dr. Rubenstein, Plaintiff "stated he had no significant shortness of breath or chest pain . . . [and] had no specific complaints at the time." Tr. 31-32, 267. Additionally, the ALJ discusses Plaintiff's complaints of back pain, but notes that he demonstrated normal gait and ability to walk during visits to Dr. Rubenstein and Dr. Fernando and the ability to stand erect without a limp during a visit to Dr. Giordano. Tr. 33-34. The ALJ also discusses Plaintiff's testimony of uncontrollable bowel movements, but notes examination records stating that that the last attack occurred in March 2010, as well as an August 2010 consultative evaluation that showed a negative exam of the abdomen. Tr. 32, 37. Plaintiff has not directed the Court to any objective medical evidence beyond Plaintiff's own testimony demonstrating he suffered from such pain and weakness such that the ALJ's determination was not supported by substantial evidence. Because the ALJ considered Plaintiff's subjective complaints, specifically explained how some of those complaints did not comport with objective medical evidence, and relied upon the complaints in determining Plaintiff's RFC, the Court finds that the ALJ did not simply bypass or disregard Plaintiff's subjective medical testimony.

### C. The ALJ's Step 4 Finding

Plaintiff's third argument challenges the ALJ's step 4 finding that Plaintiff was still able to perform past relevant work as a gate guard. Plaintiff essentially raises two arguments: (1) he cannot do light work or operate as a gate guard given his RFC limitations; and (2) the ALJ should have found that Plaintiff was completely unable to stoop. The Court disagrees with both arguments.

First, the ALJ's RFC permits the Plaintiff to perform light work, as defined in 20 C.F.R. § 404.1567(b), and to perform the tasks required of a gate guard. These findings are supported by substantial evidence. The ALJ determined that Plaintiff retained the capacity to lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently. Tr. 37-38. The ALJ also determined that that Plaintiff retained the capacity to stand, walk, or sit with normal breaks for about 6 hours in an 8-hour workday. Id. The ALJ limited the RFC, however, to occasional balancing, stooping, kneeling, crouching, and crawling, and found that the Plaintiff could never climb ladders, ropes, or scaffolds. Id.

Even with these limitations, Plaintiff's capacity meets the requirements of light work. Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Limitations on sitting or standing to 6 hours in an 8-hour day are consistent with an RFC to perform light work. See Schmidt v. Comm'r of Soc. Sec., 94 F. App'x 92, 93 (3d Cir. 2004); Social Security Ruling 96-9P, 1996 WL 374185, at *6 ("If an individual is able to stand and walk for approximately 6 hours in an 8-hour workday (and meets the other requirements for light work), there may be a significant number of light jobs in the

15

national economy that he or she can do . . . ."). Likewise, contrary to Plaintiff's assertion, light jobs can be accomplished with occasional, rather than frequent, stooping. Social Security Ruling 83-10, 1983 WL 31251, at *6.

Substantial evidence also supports Plaintiff's ability to perform past relevant work as a gate guard. According to the Department of Labor's Dictionary of Occupational Titles, a gate guard position qualifies as light work and involves the following tasks:

> Guards entrance gate of industrial plant and grounds, warehouse, or other property to control traffic to and from buildings and grounds: [sic] Opens gate to allow entrance or exit of employees, truckers, and authorized visitors. Checks credentials or approved roster before admitting anyone. Issues passes at own discretion or on instructions from superiors. Directs visitors and truckers to various parts of grounds or buildings. Inspects outgoing traffic to prevent unauthorized removal of company property or products. May record number of trucks or other carriers entering and leaving. May perform maintenance duties, such as mowing lawns and sweeping gate areas. May require permits from employees for tools or materials taken from premises. May supervise use of time clocks for recording arrival and departure of employees . . . May answer telephone and transfer calls when switchboard is closed.

Dep't of Labor, Dictionary of Occupational Titles 372.667-030, 1991 WL 673099. It adds that a gate guard must be able to perform "repetitive or short-cycle work," but activities such as climbing, stooping, kneeling, crouching, or crawling are not required (i.e., "do[] not exist"). Id. The ALJ further supported his determination with testimony from the vocational expert, Ms. Sasona. She testified that while a person with Plaintiff's limitations could not perform several of his previous jobs, that person would be able to perform the occupation of gate guard. Tr. 38, 80. The ALJ's finding that Ms. Sasona's testimony was consistent with the Occupational Titles code, and therefore that Plaintiff could perform the occupation, was supported by substantial evidence.

In response, Plaintiff points to instances where he had to climb on trucks and use ramps to inspect inventory. Pl.'s Br. at 18. Plaintiff argues this would violate the ALJ's RFC limitations.

First, Plaintiff's assertion that he had to walk up ramps does not go against his RFC, which only prohibits climbing ladders, ropes, or scaffolding. Second, the ALJ is not required to give controlling weight to personal testimonials of job function, particularly where, as here, the ALJ relied on the Dictionary of Occupational Title's description of the position. See Social Security Ruling 82-61, 1982 WL 31387 ("[I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled.").

Next, Plaintiff argues that he cannot perform light work because he is unable to stoop at all, contrary to the ALJ's finding that that he can occasionally do so. Plaintiff's argument is belied by medical and opinion evidence as well as his own testimony. The ALJ noted that Plaintiff did not allege a complete inability to stoop during the hearings. See Tr. 68-69 (listing all physical conditions from which Plaintiff is suffering without mentioning stooping). Likewise, as mentioned in detail above, multiple doctors observed Plaintiff's ability to walk, squat, bend, and get on or off the examination table without any difficulty. Accordingly, substantial evidence supports the ALJ's finding that Plaintiff was occasionally able to stoop.

## IV. CONCLUSION

Because the Court finds that the ALJ's decision is supported by substantial evidence, the Commissioner's disability determination is **AFFIRMED**. An appropriate order will follow.


/s *Madeline Cox Arleo*
**HON. MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**